Filed 8/28/23  P. v. Jetter CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>SEAN JETTER,<br><br>     Defendant and Appellant. | A163968<br><br>(Alameda County<br>Super. Ct. No. 18-CR-012936) |

A jury convicted defendant Sean Jetter of numerous felonies based on his sexual abuse of his stepson, J. Doe, beginning when Doe was four years old.  The trial court sentenced Jetter to 100 years to life in prison.

On appeal, Jetter's claims focus primarily on an expert's testimony about Child Sexual Abuse Accommodation Syndrome (CSAAS), a model that describes typical responses by child victims of sexual abuse.  Jetter claims that (1) the trial court erred by denying a mistrial after the expert testified that "very few children" falsely allege they were sexually abused and false allegations are "rare"; (2) former CALCRIM No. 1193, the standard jury instruction on CSAAS testimony, impermissibly allowed the jurors to rely on such testimony as evidence of guilt; and (3) the cumulative impact of these errors requires reversal.  Jetter also asks that we independently review Doe's medical records to determine if the court properly declined to release them to the defense.

1

Jetter is not entitled to relief.  Assuming the challenged CSAAS testimony was improper, we conclude that the trial court's instruction to the jury to disregard both the testimony and the prosecutor's argument based upon it was adequate to cure the error.[1]  We also conclude that the version of CALCRIM No. 1193 given was not erroneous and there was no cumulative error.  Finally, the trial court did not err by declining to release Doe's medical records.  We order certain errors in the abstract of judgment corrected but otherwise affirm.[2]

## I.
### FACTUAL AND PROCEDURAL BACKGROUND

#### A.    *Background*

Doe was born in March 2001 to A.H. (mother) and her then-husband. Doe has three full siblings:  a sister about nine years older (first sister); a sister about seven years older (second sister); and a brother about four years older (brother).

Mother and the children's father divorced in fall 2004.  About a year later, when Doe was four years old, mother met the 42-year-old Jetter and began dating him.  During the relevant time period, mother was a licensed marriage and family therapist employed at a jail and worked the night shift, from approximately 9:00 p.m. to 7:30 a.m.  Soon after she and Jetter began dating, she introduced him to the children, and she, Doe, and brother sometimes spent the night at Jetter's home in Hayward.  Jetter, who had a government job with daytime hours, "started offering to baby-sit because

---

[1] As a result of this conclusion, we need not consider Jetter's alternative claim that his trial counsel rendered ineffective assistance by "opening the door" for the prosecution to introduce the challenged testimony.

[2] By separate order, we deny Jetter's related petition for a writ of habeas corpus.  (*In re Jetter* (Aug. 28, 2023, A167904).)

[she] worked at night and [she] had lost her baby-sitter." He watched the children "[q]uite frequently" while she was at work.

Mother and Jetter married in September 2006, and she and the children moved into his two-bedroom mobile home. At first, all four children slept in one room and the adults slept in the other, but within months, Doe's sisters moved into a newly built third bedroom. Doe and brother stayed in their original bedroom and slept in a bunk bed, with Doe on the bottom and brother on the top.

B.      *Jetter's Abusive Behavior*

Doe, second sister, brother, and mother all testified about Jetter's physical and verbal abuse of the children. Doe testified that Jetter began physically abusing him even before the family moved into Jetter's home. When mother was not present, Jetter would slap him, throw him against the wall, and spank him with a belt. Doe was afraid to tell mother what was happening because Jetter had "a stronghold over [her]."

The physical abuse of Doe continued after Jetter married mother. Jetter spanked him with a belt "a lot," causing him to bleed, and punched him. Second sister witnessed Jetter "spank [Doe], slap him in the back of his head, and yell at him." Brother also recalled seeing Jetter "punching and slapping" Doe starting when Doe was around six years old. Second sister testified that although Doe was originally an "[e]nergetic" child, he became much quieter, "wouldn't really speak," and seemed "a lot more . . . anxious."

Brother testified that Jetter "was always rude and inconsiderate" and none of the children liked him from the first time they met him. After the family moved in with Jetter, Jetter's behavior "went from just rude and condescending to . . . more damaging," getting "progressively more and more violent as the years went on." Jetter tried to teach the boys martial arts and

3

would sometimes hit them with a stick if they made mistakes.  He also used martial arts moves on them.[3]  He called the boys names like "mother's boys, punks, bitches, sissies, [wusses], cowards," and "faggots."  Doe said that Jetter called him "an MFer or a dumb [ass]," made fun of him, and "really belittle[d]" all the children by calling them "stupid" and "worthless."

Second sister testified that Jetter was "[v]ery controlling, quick to anger, and unpredictable."  Jetter never physically abused second sister, but "it got really violent" between Jetter and first sister, who stood up to him.  First sister ultimately moved out of the home when she was about 15 years old and Doe was about 6, and second sister moved out to go to college when she was about 18 years old and Doe was about 11.

According to mother, "as time progressed," Jetter "took over" the children's discipline.  Brother agreed that Jetter "had all the control over the discipline" and "whatever he said went."  The children told mother that Jetter would wait until she left for work "and then wake them up and keep them up all night just tormenting them physically and saying horrible things to them."  Although the abuse was worse when mother was not present, she also witnessed Jetter's violence against the children.  But when she intervened, she could not stop him and he would become violent with her as well.  Mother never reported this behavior, because Jetter threatened to kill her and the children and told her no one would believe her.

C.    *The Sexual Abuse of Doe*

Doe testified that Jetter began sexually abusing him before the marriage, while babysitting Doe for mother.  Doe recalled that during the first incident, Jetter woke him up, took him to Jetter's room, and told Doe to

---

[3] Brother testified that Jetter was six feet tall and weighed 350 pounds and was "[a] lot bigger" than the brothers.

pull down his pants. Jetter made Doe orally copulate him and then forcibly sodomized Doe. After Jetter ejaculated inside Doe, he told Doe not to tell or he would kill Doe and his family.

The sexual abuse continued until Doe was in third grade. During "the normal routine," Jetter would take Doe from Doe's bed, bring him into Jetter's room, make Doe orally copulate him, and then sodomize Doe. Sometimes, Jetter put his mouth or hands directly on Doe's penis. Once, when Doe was home sick from school, mother made him stay in bed with Jetter, and Jetter sodomized him. Although Doe initially tried to resist, as the abuse continued he "stopped fighting back" because he "knew there was nothing [he] could do about it."

Doe testified that Jetter both put his penis in Doe's mouth and sodomized Doe at least once a month from the time Doe was four years old to the time he was nine. On several occasions, "a little bit" of blood would be "dripping" from Doe's anus as a result of the sodomy. When this happened, Jetter would put him in the bathtub to clean him and sometimes used rubbing alcohol on his wounds. Doe testified that Jetter "took breaks" from abusing him after causing him to bleed, but the injuries were never severe enough that Doe had to visit the doctor, and he never told mother about them. The sexual abuse finally stopped when Doe was in third grade, after he threatened to go to the police.

Neither second sister nor brother was aware of the sexual abuse of Doe while it was occurring. Second sister testified that early on, while all the children shared a room, she did not remember Doe getting out of bed during the night. Brother testified that he never noticed Doe gone from their bedroom during the night, although brother was "a pretty heavy sleeper [and] . . . rarely woke up in the middle of the night." Both siblings agreed,

5

however, that Jetter routinely came in the children's bedrooms at night and shined a flashlight on them. And eventually, after second sister moved out of the home and was "able to process a lot more things about [her] childhood," she began to suspect Doe had been sexually abused because "[h]e was just so shut off and so quiet, so anxious and just so afraid at the time."

### D. The Final Years in Jetter's Home

Doe testified that after Jetter stopped sexually abusing him, the physical abuse "got a lot worse." Once, when Doe was about 13 years old, Jetter "attacked [him] really, really bad," punching Doe on the back of his head. Doe suspected that he suffered a concussion as a result because his "vision would go black a lot" and he was dizzy.

During a different incident around the same time, Jetter "pinned [Doe] to the ground," and brother ran into the room with a baseball bat to stop Jetter. Doe reported the physical abuse to his school counselor, and the school called the police. The police contacted brother, who told them that Jetter was verbally abusive but denied any physical abuse. Brother testified that he lied because Jetter "always instructed" the boys to say they were fine if the police asked.

Meanwhile, mother and Jetter's marriage was disintegrating. She, Doe, and brother moved out of Jetter's home in January 2015, and she ultimately divorced Jetter. Afterward, Doe had little contact with Jetter. When asked at trial how he felt about his former stepfather, Doe said, "I strongly, strongly, strongly dislike him, hate him. I think he's a very bad person, horrible human being. He's caused me pain and agony throughout my life and my childhood. I didn't really get to enjoy it as much because of how he was."

6

The police investigation of Jetter began after Doe became intoxicated in spring 2017, when he was 16 years old, and disclosed the sexual abuse to mother.  Doe testified that on April 20 of that year, he bought a brownie at his high school without knowing that it contained marijuana.  After school, while hanging out with a friend at the park, he ate the brownie and became high.

The friend, who testified for the defense, called into question some of Doe's story.  The friend claimed he, Doe, and another acquaintance planned to smoke marijuana at the park.  The acquaintance, who also testified for the defense, corroborated that the three went to the park and smoked marijuana.  The friend stated that afterward, Doe's behavior became "extreme[]," swinging from elation to depression.  To avoid getting in trouble with mother, Doe and his friend decided to make up the story about Doe inadvertently consuming a marijuana brownie.

Consistent with this testimony by the friend, mother testified that the friend called her and told her he had tricked Doe into eating a marijuana brownie and "it had a bad [e]ffect on him."  She contacted the police, and Doe was transported to the hospital, where she met him.  Mother testified that Doe "was really silly, giggl[y], talking really fast," and "seemed high."  He was also talking a lot, which was out of character because he was normally "very quiet" and "very shy."

After Doe had been "going on and on and on" for a while, he began "saying bad things about himself like 'I'm so stupid' and something about [Jetter] was right."  According to mother, Doe then told her for the first time

7

that Jetter had molested him.[4] Shocked, mother took a video recording of Doe repeating what he had said. On the recording, which was played for the jury, Doe stated that Jetter made him grab Jetter's penis and that Jetter "play[ed] with" Doe's penis.

Brother testified that Doe called him from the hospital and told brother "what [Jetter] . . . did to him," including oral sex. In the same conversation, Doe also reported "that [Jetter] said that he would kill [Doe] if [Doe] ever told anybody."

The following day, mother took Doe to a Hayward police station to report the sexual abuse. A forensic interview of Doe was conducted on May 22, 2017, at the Child Abuse, Listening, Interview, and Coordination center (CALICO). The interview was not admitted into evidence, but Doe testified that during the interview he was not yet "ready to disclose the full extent of [Jetter's] sexual abuse" because it was traumatic and he was "very embarrassed." He also indicated during this interview that he first reported the abuse to mother the previous year at the hospital, referring to the outpatient program.

After the CALICO interview, Doe made a pretext call to Jetter under the supervision of a Hayward police officer. During the call, a recording of which was played for the jury, Doe told Jetter that he was "trying to forgive [Jetter] and move on." Jetter responded, "Okay, thank you. Let's just forgive each other and move on." After Doe said he was having trouble sleeping and Jetter asked what was wrong, Doe responded, "You violated my trust. I

---

[4] Doe testified that he first reported the sexual abuse to an outpatient program he attended at Fremont Hospital sometime before the marijuana incident and that mother was present when he did so. He claimed the program called the police but there was no follow-up. A police officer testified there was no record of any such complaint.

didn't violate yours." Jetter said, "Well[,] can you forgive me?," and Doe said he could. Jetter apologized and said he "was wrong," at which point Doe stated, "You made me touch you." Jetter indicated he could not hear Doe, and Doe repeated himself twice. Jetter then said, "What you talking about?" Doe responded, "You know what I'm talking about," and Jetter hung up the phone.[5]

Doe, whom the police officer described as "uncomfortable and nervous," declined to make another pretext call. He was also unsure whether he wanted to press charges against Jetter. Doe testified that the pretext call made him "angry" because Jetter would not admit what he had done. Doe acknowledged that after making the call, he sent Jetter a text message in which he told Jetter to "fuck off" and "[s]tay away from children." Doe also texted Jetter about Jetter's ex-wife and another woman with whom Jetter had cheated on mother, telling Jetter he had "really fucked up people's lives."

Second sister testified that in 2018, a year after the marijuana incident, Doe told her that Jetter "had made him give blow jobs and touch [Jetter's] penis" and Jetter had also touched his penis. Later, Doe said the sexual abuse began before mother and Jetter married and "that from the age of four [Jetter] had been raping [Doe] multiple times a week for years." Doe testified that second sister was the first person to whom he recounted the full details of the sexual abuse.

After talking to second sister, Doe called mother, who was out of the country, and mother testified that he reported that "he was sodomized repeatedly and all kinds of horrible things [were] done to him." She came home early from her trip, and Doe contacted the same police officer and said

---

[5] A few hours later, Jetter called the Hayward police and reported having received this call.

"he had more information that he wanted to share." The officer indicated that "he apologized for not disclosing before" and said "he was ready to talk about the full extent of his sexual abuse." As a result, another forensic interview was conducted at CALICO on February 15, 2018. Again, this interview was not introduced into evidence, but Doe testified that at this point he reported all of the sexual abuse Jetter inflicted on him.

A pediatrician with experience in child abuse cases examined Doe the following month. Doe was "completely physically healthy," and there were no remarkable aspects about his buttocks or anus. Given the passage of time since the reported sexual abuse, this "normal exam" did not prove or disprove that the abuse happened, and the pediatrician would not have expected to see any indications of trauma to Doe's anus area. On cross-examination, the pediatrician testified that "most acts of sodomy don't cause physical injury to the body" and "gushing of blood is uncommon."

### F.     The Verdicts and Sentencing

Jetter was arrested in September 2018. He was charged with 12 felony counts: two counts of aggravated sexual assault of a child (sodomy) and two counts of aggravated sexual assault of a child (oral copulation), for periods when Doe was 4 and 5 years old; and four counts of intercourse or sodomy with a child 10 years of age or younger and four counts of oral copulation or sexual penetration with a child 10 years of age or younger, for periods when Doe was 6, 7, 8, and 9 years old.[6] The jury convicted Jetter of all these

---

[6] The charges were brought under Penal Code sections 269, subdivision (a)(3) (aggravated sexual assault – sodomy) and (a)(4) (aggravated sexual assault – oral copulation), and 288.7, subdivisions (a) (intercourse or sodomy with child 10 or younger) and (b) (oral copulation or sexual penetration with child 10 or younger). Jetter was also charged with one count of continuous sexual abuse under Penal Code section 288.5,

10

charges. In November 2021, the trial court sentenced him to 100 years to life in prison, composed of four consecutive terms of 15 years to life for the convictions of aggravated sexual assault, a consecutive term of 25 years to life for the conviction of intercourse or sodomy with a child 10 years of age or younger committed when Doe was 6 years old, a consecutive term of 15 years to life for the conviction of oral copulation or sexual penetration with a child 10 years of age or younger committed when Doe was 6 years old, three concurrent terms of 25 years to life for the remaining convictions of intercourse or sodomy with a child 10 years of age, and three concurrent terms of 15 years to life for the remaining convictions of oral copulation or sexual penetration with a child 10 years of age or younger.

II.

DISCUSSION

A.    *Jetter's Claims Related to the CSAAS Testimony Fail.*

Jetter claims the trial court erred by striking the CSAAS expert's testimony about the rarity of false allegations and the prosecutor's related argument instead of granting a mistrial. He also claims the jury instruction on CSAAS, former CALCRIM No. 1193, incorrectly stated the law, and the cumulative effect of these errors requires reversal. We conclude that Jetter is not entitled to relief.

1.    Additional facts

Before trial, the parties agreed that the expert on CSAAS could not testify about the statistical probability of false allegations. Consistent with this agreement, the trial court ruled that there "will be no use of percentages

---

subdivision (a), but on the People's motion that count was dismissed before trial.

11

. . . [or] synonyms [of] percentages, like, Oh, this is extremely rare, that type of thing."

The prosecutor noted the caveat, however, that "it's typically the defense'[s] questions that . . . open the door to certain testimony," and the trial court responded, "If the door's blown open, the door's blow open, and . . . that would have to be a ruling I make at a later point in time. But based on defense counsel's representations I think he would probably tread lightly and carefully as to what he's doing in cross-examination." Jetter's trial counsel stated that he planned to cross-examine on the idea that certain behavior CSAAS explains, like retracting allegations, may also be consistent with the fact the allegations are false, and the court agreed that such cross-examination would not "open the door to statistics or anything of that nature."

The parties and trial court also discussed CALCRIM No. 1193, which explains the limited purpose of CSAAS testimony. To preserve the issue for appeal, Jetter's trial counsel reiterated his position, already rejected by the court, that the CALJIC instruction on CSAAS should be given instead because that instruction "more clearly explains that [CSAAS] starts from the premise that the allegation [of sexual abuse] is true."

The parties then agreed that CALCRIM No. 1193 should be read both before the expert witness, Dr. Blake Carmichael, Ph.D., testified and at the end with the rest of the final instructions. Thus, before Dr. Carmichael was called as a witness, the trial court instructed under CALCRIM No. 1193 as follows: "You will hear testimony from Dr. Blake Carmichael regarding [CSAAS]. Dr. Carmichael's testimony about [CSAAS] is not evidence that the defendant committed any of the crimes charged against him. You may consider this evidence only in deciding whether or not . . . Doe's conduct was

12

not inconsistent with the conduct of someone who has been molested and in evaluating the believability of his testimony."[7]

Dr. Carmichael, a clinical psychologist, was qualified as an expert on CSAAS. He explained that CSAAS is "an educational tool to help inform people about kids who have been sexually abused" and "dispel some of [the] presumptions" about child victims' typical behavior. It is not a "diagnostic tool" and is not used "to determine if a kid was abused." He had not reviewed any information about this case, and he could not offer an opinion about whether Doe was sexually molested, which was "the province of the jury" to decide.

As described by Dr. Carmichael, CSAAS has five components: secrecy; helplessness; entrapment or accommodation; delayed, unconvincing, and conflicted disclosure; and retraction or recantation. These components explain behavior by sexually abused children that might otherwise seem inconsistent with their allegations, including not resisting abuse or not immediately disclosing it.

On cross-examination, Jetter's trial counsel focused on false allegations of sexual abuse, eliciting testimony that CSAAS is not based on observations of children who made false allegations and that such children could display behavior consistent with various components of CSAAS. In responding to counsel's questions, Dr. Carmichael indicated that a "small population of

_____

[7] The jury was read the version of the instruction in effect when Jetter was tried in summer 2021. (CALCRIM No. 1193 (2021 ed.) p. 946.) The instruction has since been revised to (1) add a paragraph stating that CSAAS "relates to a pattern of behavior that may be present in child sexual abuse cases" and CSAAS testimony "is offered only to explain certain behavior of an alleged victim of child sexual abuse"; and (2) change the final sentence's double negative of "not inconsistent" to "consistent."

kids" make false allegations and such allegations occurred in only "a small minority of situations . . . documented."

Defense counsel then questioned Dr. Carmichael about the 1983 article originally describing CSAAS. At one point, counsel asked Dr. Carmichael if the article's author "[took] the radical position that there's no such thing as a false allegation." Dr. Carmichael answered in the negative, and counsel asked him to confirm the following quote was in the article: " 'It [has] become a maxim among child sexual abuse intervention counselors and investigators that children never fabricate the kind of explicit sexual manipulations they divulge in complaints or interrogations.' " Dr. Carmichael responded, "Well, he wrote the sentence you read but he did not agree with that. So that's why it's important to understand the context of [it]. So in summary, avoiding—" Counsel interrupted this response to approach the bench and then said he had no further questions.

On redirect, the prosecutor asked, "Without getting into any numbers, percentages, things like that, isn't it true that very few children have ever been found to exaggerate or even invent claims of sexual molestation?" Dr. Carmichael responded, "That is true. That in fact what we're finding is that most kids will minimize the [e]ffect [of] having been abused. And that is something that is reliably found in the literature." Defense counsel objected and moved to strike, and the trial court overruled the objection. The prosecutor continued, "So when asked . . . all those questions related to false allegations, in fact it's rare that that happens?" Dr. Carmichael agreed, stating, "The research in that area shows that it is rare, doesn't happen with great frequency."

During the next break, the trial court and parties discussed the defense's motion for a mistrial that was initially made off the record. The

14

motion was based on the prosecutor's last question on redirect about the rarity of false allegations, which defense counsel argued violated the pretrial order limiting Dr. Carmichael's testimony. The prosecutor responded that defense counsel opened the door by asking "numerous questions" about false allegations and reading an out-of-context quotation from the CSAAS article.

The trial court denied the motion for a mistrial. The court acknowledged its original ruling that no percentages or "synonyms" could be used when discussing false allegations, but it found that defense counsel "opened the door" by reading the article quotation. This was because the immediately preceding sentence in the article read, "[V]ery few children[,] no more th[a]n two or three per thousand, have ever been found to exaggerate or to invent claims of sexual molestation." The court explained that it allowed the challenged testimony about the rarity of false allegations to provide "the full context of the document."

In closing, the prosecutor discussed Dr. Carmichael's testimony at length, explaining how the evidence of Doe's sexual abuse and his reactions reflected various CSAAS components. Defense counsel emphasized that the CSAAS testimony was not evidence of guilt and argued that his cross-examination of Dr. Carmichael showed that "all these behaviors that are not inconsistent with molestation are also not inconsistent with [being] falsely accused."

On rebuttal, the prosecutor explained that the only possible defense in this case was that Doe was lying, and that was "[s]omething that [the defense] tried to get Dr. Carmichael to buy into with all those questions about false allegations." She continued, "But Dr. Carmichael told you that very few children have ever been found to exaggerate or invent claims of sexual

15

molestation. That in fact, he said it's more likely that children downplay or minimize the full extent of the sexual abuse that they've suffered."

The defense again moved for a mistrial, citing Dr. Carmichael's testimony about the rarity of false allegations and the prosecutor's rebuttal argument based upon it. The motion relied on *People v. Lapenias* (2021) 67 Cal.App.5th 162 (*Lapenias*), a then-recent opinion in which the Fourth District Court of Appeal held that a trial court erred by permitting Dr. Carmichael to testify that it was "rare" for children to make false allegations of sexual abuse. (*Id.* at pp. 176–177.) Although the motion emphasized the defense's position that the evidence's prejudicial effect could not be cured, it requested in the alternative that the challenged testimony and argument be stricken and the jury be instructed to disregard them.

The trial court agreed that the challenged testimony was improper, but it did not grant the motion for a mistrial. Instead, it concluded that a curative instruction was appropriate. Before reading the other jury instructions, which also included another reading of CALCRIM No. 1193, the court instructed the jury as follows:

> "Dr. Carmichael testified that false abuse allegations are rare. Dr. Carmichael's statement was improperly admitted into evidence. You are hereby instructed that Dr. Carmichael's statement is stricken from the record and you are not to consider it or rely on it in any way in forming your verdict in this case.

> "During rebuttal argument the prosecution argued you should consider Dr. Carmichael's testimony that false abuse allegations are rare in determining whether . . . Doe is telling the truth in this case. Because Dr. Carmichael's statement is not admissible evidence, any argument made by the prosecution based on that statement is stricken from the record and you may not consider the prosecution's argument on that issue or rely on it in any way in forming your verdict in this case.

16

"You are further instructed that any argument made by either party is not evidence in this case. As jurors, you have heard the evidence in this case. You have seen each witness testify. It is your duty to assess the credibility of each witness. Each of you and only you must determine whether the claims of abuse are true."

> 2.     The trial court adequately addressed the challenged CSAAS testimony by giving a curative instruction.

Jetter claims the trial court erred by refusing to grant a mistrial based on Dr. Carmichael's testimony about the rarity of false sexual-abuse allegations. He argues that the court's instruction to disregard that testimony and the prosecutor's subsequent argument was insufficient to fix the resulting "profound prejudice." We are not persuaded.

To begin with, although it is true that the trial court initially allowed Dr. Carmichael's testimony about the rarity of false allegations to stand, the court then reversed course and struck both that testimony and the prosecutor's rebuttal argument based upon it. Thus, we are puzzled by Jetter's extended discussion of his claim that the court abused its discretion by admitting the challenged testimony, including by relying on the " 'open the door' fallacy." There is no real dispute on appeal that if we assume Jetter's trial counsel did not "open the door" through his questioning, the testimony and resulting argument were improper under *Lapenias*. That decision, which was filed the day before Dr. Carmichael testified, held that "testimony that it is 'rare' for children to make false allegations of sexual abuse [is] inadmissible" because it amounts to an opinion on another person's veracity and goes "considerably beyond the limited purpose of CSAAS evidence (to explain the typical behaviors of sexually abused children, such as delayed

17

reporting)."[8] (*Lapenias*, *supra*, 67 Cal.App.5th at p. 179.) *Lapenias* extended prior cases holding it was error to admit testimony about the statistical frequency of false allegations, concluding " 'there [was] no meaningful distinction between giving a statistic that indicates that false allegations are rare and stating that children rarely make false allegations without explicitly quantifying the word "rare." ' " (*Id.* at pp. 179–180; see *People v. Julian* (2019) 34 Cal.App.5th 878, 885–886; *People v. Wilson* (2019) 33 Cal.App.5th 559, 570–571 (*Wilson*).)

The main disputed issue on appeal is whether the prejudicial effect of the challenged testimony and accompanying rebuttal argument could not be cured, requiring the trial court to grant a mistrial. " ' "A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction." ' " (*People v. Dement* (2011) 53 Cal.4th 1, 39.) We review the denial of a mistrial for an abuse of discretion, as " ' "[w]hether a particular incident is incurably prejudicial is by its nature a speculative matter" ' " that a trial court has " ' "considerable discretion" ' " to determine. (*Id.* at pp. 39–40; *People v. Clark* (2011) 52 Cal.4th 856, 990.)

" 'Although most cases involve prosecutorial or juror misconduct as the basis for the [mistrial] motion, a witness's volunteered statement can also provide the basis for a finding of incurable prejudice.' " (*People v. Dement*, *supra*, 53 Cal.4th at p. 40.) Jetter does not claim the prosecutor committed misconduct in eliciting the challenged testimony, which the trial court originally permitted. Therefore, our analysis proceeds in line with other cases where a witness's improper testimony "is not attributable to either

---

[8] The Attorney General creatively claims that the challenged testimony's primary effect was to bolster the research supporting the 1983 article on CSAAS, not Doe's credibility, but he never directly argues that the testimony or resulting rebuttal argument were proper.

party," in which case "a mistrial is called for only if the [testimony] is so inherently prejudicial as to threaten [the] defendant's right to a fair trial despite admonitions from the court." (*People v. Molano* (2019) 7 Cal.5th 620, 675–676.)

Jetter cites several decades-old cases addressing the prejudicial effect of certain evidence, but none of them involved CSAAS testimony, and he does not explain why they nonetheless establish that Dr. Carmichael's testimony was incurably prejudicial. He also claims the testimony rendered his trial "fundamentally unfair" in violation of his federal due process rights, but the admission of CSAAS testimony about the rarity of false allegations is state-law error, not federal constitutional error. (*Wilson*, *supra*, 33 Cal.App.5th at pp. 571–572; accord *Lapenias*, *supra*, 67 Cal.App.5th at p. 180.)

Indeed, both *Wilson* and *Lapenias* held that the error in admitting CSAAS testimony about the rarity of false allegations was harmless under *People v. Watson* (1956) 46 Cal.2d 818, 836, even though the jury was permitted to consider the evidence at trial. (*Lapenias*, *supra*, 67 Cal.App.5th at p. 180; *Wilson*, *supra*, 33 Cal.App.5th at p. 572.) Here, in contrast, the trial court instructed the jury to disregard both the challenged testimony and the prosecutor's argument based upon it. Moreover, the jury received other instructions further minimizing the potential prejudice, including CALCRIM No. 226 on its duty to judge the credibility of witnesses and CALCRIM No. 332 on its ability to disregard expert testimony. (See *Lapenias*, at p. 180; *Wilson*, at p. 572.) In the absence of any indication to the contrary, we generally presume that the jury understood and followed all the court's instructions, including the curative instruction. (*People v. Ramirez* (2021) 10 Cal.5th 983, 1017–1018; *Lapenias*, at p. 180; *People v. Navarette* (2010) 181 Cal.App.4th 828, 834.)

Jetter also argues that even if the instruction to disregard the challenged evidence and argument could have otherwise cured the prejudice, "refusing to give [it] until a full seven days after the impermissible testimony, and four days after the prosecution relied on it in rebuttal, rendered it essentially impossible" that the instruction would be effective. Jetter provides no authority to support this claim, and on this record it is "mere speculation" to conclude that the jury disregarded the instruction merely because it was not given immediately. (*People v. Wharton* (1991) 53 Cal.3d 522, 566 [mistrial properly denied even though jury not admonished to disregard improper testimony until four days later].)

In short, even assuming that Dr. Carmichael's testimony about the rarity of false allegations was improperly admitted, we conclude that the instruction to the jury to disregard that testimony and the prosecutor's related argument was sufficient to address any resulting prejudice. As a result, the trial court did not err by denying Jetter's motion for a mistrial.

3. Former CALCRIM No. 1193 accurately stated the law.

Jetter also claims the trial court erred by giving CALCRIM No. 1193 because the instruction misstates the law and reduces the prosecution's burden of proof. We are not persuaded.

"CSAAS expert testimony is not admissible to prove the complaining witness has in fact been sexually abused," but "[i]t is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident is inconsistent with [the child's] testimony claiming molestation." (*People v. Gonzales* (2017) 16 Cal.App.5th 494, 503 (*Gonzales*).) " 'Such expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the

emotional antecedents of abused children's seemingly self-impeaching behavior.' " (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1301.)

We review de novo whether a jury instruction is legally correct. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) "In assessing a claim of instructional error, we examine the instructions as a whole. The test we apply is whether there is a reasonable likelihood the jurors would have understood the instructions in a manner that violated a defendant's rights. [Citation.] In this regard, we presume that jurors are intelligent individuals who are capable of understanding instructions and applying them to the facts of the case before them." (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1246.)

According to Jetter, the challenged instruction's statement that CSAAS testimony is not evidence of the defendant's guilt "cannot be reconciled" with the immediately following statement that such testimony may be used "in evaluating the believability of [the victim's] testimony." This is so, he claims, because "[w]hen a witness's account is the only evidence the defendant committed the charged offenses, it is not possible to use [CSAAS] testimony to evaluate his believability, and simultaneously *not* use the testimony as evidence that the defendant committed those offenses."

The Second District Court of Appeal addressed a similar argument in *Gonzales*. There, the defendant argued that former CALCRIM No. 1193 was "inconsistent" because it was "impossible to use the CSAAS testimony to evaluate the believability of [the victim's] testimony without using it as proof that [the defendant] committed the charged crimes." (*Gonzales*, *supra*, 16 Cal.App.5th at p. 503.) *Gonzales* disagreed, determining that "[a] reasonable juror would understand" that the CSAAS testimony could be used "to conclude that [the victim's] behavior does not mean she lied when she said

21

she was abused" but not "to conclude [the victim] was, in fact, molested." (*Id.* at p. 504.) In other words, a juror who accepts CSAAS testimony would "find both that [the victim's] apparently self-impeaching behavior does not affect her believability one way or the other, and that the CSAAS evidence does not show she had been molested." (*Ibid.*)

The same division of the Second District adhered to *Gonzales* in *People v. Munch* (2020) 52 Cal.App.5th 464, 474, and the Fourth District Court of Appeal agreed with *Gonzales* and *Munch* that "the official jury instruction accurately instructs the jury on the law: the proper use—and the proper limitations on the use—of CSAAS evidence." (*Lapenias*, *supra*, 67 Cal.App.5th at pp. 175–176.) We are persuaded by the reasoning in *Gonzales*, and we also conclude that former CALCRIM No. 1193 accurately states the law.

Jetter argues that "*Gonzales* is factually distinguishable" because "the expert there testified more extensively than Dr. Carmichael that CSAAS could not be used to determine if the defendant was guilty." In reaching its holding, *Gonzales* emphasized that CALCRIM No. 1193 "must be understood in the context of [the expert's] testimony. [The expert] testified that CSAAS is not a tool to help diagnose whether a child has actually been abused. She said that *if it is not known whether a child has been abused, CSAAS is not helpful in determining whether a child has, in fact, been abused.* The purpose of CSAAS is to understand a child's reactions when they have been abused." (*Gonzales*, *supra*, 16 Cal.App.5th at pp. 503–504, italics added.)

Although Jetter is correct that Dr. Carmichael did not make a statement exactly like the italicized one above, his testimony did not appreciably differ from that of the expert in *Gonzales*. Dr. Carmichael

22

likewise testified that CSAAS explains certain behavior "that kids do after they've been abused as opposed to trying to determine [whether] the kid had been abused or not." He also repeatedly stated that CSAAS is not "diagnostic tool" or "checklist" for determining if a child was sexually abused. This testimony effectively conveyed the same message as that in *Gonzales*, that CSAAS is not used to determine whether a child has been sexually abused.

Jetter makes other arguments not raised in *Gonzales* or the other decisions following it. He first challenges what he calls "CALCRIM No. 1193's most problematic statement: that the jury may use CSAAS testimony to determine if the complainant's behavior 'was not inconsistent with' that of a sexual abuse victim." He contends the instruction thus "allowed the jury to use CSAAS evidence in a prohibited way, as a diagnostic tool, by concluding that because [Doe's] conduct was 'consistent with' those of sexual abuse victims, his claims were true."

There is no reasonable likelihood that a juror would interpret this portion of the challenged instruction to permit use of CSAAS as a diagnostic tool. Dr. Carmichael unambiguously testified that CSAAS is *not* a diagnostic tool or checklist for determining whether a child has been sexually abused. Moreover, although Jetter claims the "not inconsistent" double negative is "confusing," it conveyed the basic concept that CSAAS testimony seeks to explain why certain behavior does not, contrary to common opinion, suggest that the victim's allegations are false. Thus, a reasonable juror would understand this particular statement, like former CALCRIM No. 1193 as a whole, to mean that the jury could use CSAAS testimony "to conclude that [the victim's] behavior [did] not mean [the victim] lied . . . [about being] abused." (*Gonzales, supra,* 16 Cal.App.5th at p. 504.)

23

Jetter also claims that CALCRIM No. 1193 "is fundamentally argumentative because it expressly permits jurors to use CSAAS evidence to determine if the complainant's behavior is consistent with that of a sexual abuse victim, but ignores the defensive inference that the same behavior might suggest falsity." In other words, he attacks the instruction's failure to state that the behavior CSAAS explains also supports an inference that the victim is lying. But the point of CSAAS testimony is to rebut *common misconceptions* about how child victims of sexual abuse behave (*People v. McAlpin*, *supra*, 53 Cal.3d at p. 1301), and it is not necessary to instruct on what those misconceptions are.

In any event, Jetter never sought below to modify the instruction in this manner, meaning he forfeited this argument. (See *People v. Mason* (2013) 218 Cal.App.4th 818, 823 [claim that jury instruction was incomplete forfeited unless clarifying or amplifying language requested].) He did argue that CALJIC No. 10.64 should be given instead, but that instruction does not say anything to the effect that a victim's behavior may suggest the victim is lying. (See CALJIC No. 10.64.)

Finally, Jetter also objects that the challenged instruction does not "offer jurors the option of rejecting CSAAS's explanation for a witness's conduct." But the jury received other instructions that adequately conveyed their ability to believe or disbelieve witness, including CALCRIM Nos. 226 and 302. And as to expert witnesses in particular, the jury was instructed under CALCRIM No. 332, "You must consider the [expert] opinions, but you are not required to accept them as true or correct. The meaning and importance of any opinion are for you to decide. . . . [¶] You may disregard any opinion that you find unbelievable, unreasonable, or unsupported by the

24

evidence." Thus, the instructions as a whole unambiguously informed jurors that they were not required to credit Dr. Carmichael's testimony.

> 4. There was no cumulative error.

As discussed above, although we have assumed that Dr. Carmichael's testimony about the rarity of false allegations was improperly admitted, the trial court's curative instruction adequately addressed the error's prejudicial effect. In addition, the trial court did not err by giving former CALCRIM No. 1193. Therefore, Jetter's claim of cumulative error fails. (See *People v. Capers* (2019) 7 Cal.5th 989, 1017 [no cumulative error where "no errors to aggregate"].)

> **B.** *The Trial Court Did Not Err by Refusing to Disclose Certain of Doe's Medical Records to the Defense.*

At Jetter's request, and without objection by the Attorney General, we reviewed medical records of Doe that the trial court placed under seal. Having done so, we are satisfied that the court correctly declined to provide the records to the defense.

> 1. Additional facts

Before trial, Jetter moved to compel the release of Doe's medical records "to corroborate or dispel" Doe's allegations of anal bleeding. Jetter asked the trial court to conduct an in-camera review of the documents, which he had subpoenaed, and release any that were relevant "to establish there was never any treatment of [Doe] for anal bleeding."[9]

At a hearing, Jetter's trial counsel stated that he did not expect the subpoenaed medical records to contain evidence supporting the allegation that Doe "was sodomized and repeatedly had massive amounts of blood loss

---

[9] The prosecution subpoenaed Doe's medical records from the 2017 marijuana incident and the 2018 child-abuse physical examination. Those documents were disclosed to the defense and are not at issue on appeal.

25

from the anus." The trial court responded that it had reviewed the records and could "represent that there [was] no such evidence" in them. The court described the records as being "more contemporaneous psych records, school records, things of that nature, a history of [Doe's] medical health that is unrelated to any allegations," and it concluded that Doe's privacy rights outweighed Jetter's interest in disclosure.[10] The court noted that its determination might change if it saw "something that would be useful in impeachment."

Defense counsel then asked the trial court "to instruct the jury that you have gone over his records and found nothing supporting massive anal bleeding." The court declined to do so, concluding it would be improper for it "to make a representation to the jury as to the state of the evidence." Counsel could, however, attempt to establish that Doe was not treated for anal injuries by other means, such as questioning Doe.

After the trial began, the trial court stated that having heard some evidence and the defense theory of the case, it now believed that one page of the medical records at issue was relevant. The court disclosed that page to the defense, but it is unclear from the record what information the document contained. As mentioned above, Doe ultimately testified that he never sought medical care for injuries to his anus.

> 2. The trial court properly declined to disclose the sealed records to the defense.

Jetter does not specify the legal standards governing whether confidential medical records must be disclosed to the defense. He states merely that "his Fourteenth Amendment right to due process and a

---

[10] The trial court also made an in camera record of its reasoning for denying disclosure of the medical records, during which it said substantially the same thing.

26

meaningful appeal require" us to review the documents to determine whether the trial court "abused its discretion" by not releasing them to the defense. He also states in passing that we must determine whether the court erred by failing to instruct the jury that the records "did not support [Doe's] allegations of 'massive anal bleeding,'" but he fails to provide any authority governing that issue. Finally, Jetter took no action to have the sealed records transmitted to this court. Thus, his claim on appeal is forfeited. (See *People v. Chubbuck* (2019) 43 Cal.App.5th 1, 12 [failure to provide adequate record defeats claim on appeal]; *Tellez v. Rich Voss Trucking, Inc.* (2015) 240 Cal.App.4th 1052, 1066 [claim forfeited if not supported "with reasoned argument and citations to authority"].)

Nonetheless, we have obtained the sealed medical records and independently reviewed them. Having done so, we can confirm that the trial court correctly represented that they do not contain any information about injuries to Doe's anus. Moreover, the jury heard Doe's testimony that he never sought care for such injuries, making the medical records far less crucial for establishing that fact. Since Jetter has never identified any other reason the records should have been disclosed to him, we are satisfied that the court properly declined his request.

C.      *The Abstract of Judgment Must Be Corrected.*

Finally, we address certain clerical errors in the abstract of judgment, which all consist of discrepancies with the trial court's oral pronouncement of the sentence. Although the parties did not identify them, on our own motion we may order the abstract corrected to reflect the court's oral pronouncement. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185.)

First, the abstract of judgment incorrectly reflects that Jetter was sentenced to life without the possibility of parole on all 12 counts, even

27

though he did not receive an LWOP sentence. Second, the length of the concurrent terms imposed (25 years to life on counts 7, 9, and 11, and 15 years to life on counts 8, 10, and 12) is not indicated, as the abstract identifies only the indeterminate terms imposed for the first six counts. Third, the abstract states that both the total and actual custody credits earned were 1,156 days, but while Jetter did actually serve 1,156 days, as the trial court stated, he received credit for only 173 days (15 percent of 1,156). Fourth, the abstract states, "Per order of the court, fines and fees are stayed," but the court did not stay any fines and fees at sentencing. And finally, the court imposed a sex-offender fine of $500 under Penal Code section 290.3, which the abstract does not reflect. The abstract of judgment must be amended to fix these inconsistencies.

## III.
### DISPOSITION

The trial court is directed to prepare an amended abstract of judgment correcting the errors identified above. The amended abstract of judgment shall be forwarded to the Department of Corrections and Rehabilitation. Otherwise, the judgment is affirmed.

28

_____

Humes, P.J.

WE CONCUR:

_____

Margulies, J.

_____

Banke, J.

*People v. Jetter*  A163968